IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN R. HOOKER,

    *Plaintiff*,

    v.                              Civil Action No. ELH-10-3019

HILTON HOTELS CORPORATION,

    *Defendant*.

**MEMORANDUM OPINION**

John R. Hooker, plaintiff, was employed by Hilton Worldwide, Inc. ("Hilton"), defendant,[1] as an Assistant Executive Steward at the "Hilton Baltimore" hotel in downtown Baltimore, Maryland. His employment was terminated on January 12, 2009, on the basis of a subordinate employee's allegation that Mr. Hooker had sexually harassed her while both were working at the hotel on the night of New Year's Eve, December 31, 2008. Thereafter, Mr. Hooker filed suit against Hilton, alleging that, by terminating him based on his female co-worker's account of the events, without conducting a "fair and adequate investigation," Hilton discriminated against him on the basis of sex. Complaint at 1 (ECF 1). He asserted a single count of employment discrimination under Title VII of the Civil Rights Act of 1964, as codified at 42 U.S.C. §§ 2000e *et seq.*

After the conclusion of discovery, Hilton filed a motion for summary judgment ("Motion") (ECF 15), which has been fully briefed.[2] No hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will grant Hilton's Motion.

---

[1] Although plaintiff sued Hilton under the name "Hilton Hotels Corporation," the parties agree that defendant's proper name is Hilton Worldwide, Inc. *See* ECF 15-1 at 1; ECF 20-1 at 1.

[2] In addition to the Motion, I have considered plaintiff's Response (ECF 20), Hilton's Reply (ECF 23), and the parties' exhibits.

**Background**

A.  Legal Background

Before detailing the underlying facts, it is helpful to provide some context regarding the

law that governs plaintiff's claim and the procedural posture of this case.

Title VII prohibits discrimination in employment on the basis of particular illegitimate

considerations.  As relevant to this case, Title VII provides that it is "an unlawful employment

practice for an employer . . . to discharge any individual, or otherwise to discriminate against any

individual with respect to his [or her] compensation, terms, conditions, or privileges of

employment, because of such individual's . . . sex . . . ."   42 U.S.C. § 2000e-2(a)(1).   As

amended by the Civil Rights Act of 1991, Title VII expressly provides for "mixed-motive"

liability, stating: "Except as otherwise provided in this subchapter, an unlawful employment

practice is established when the complaining party demonstrates that . . . sex . . . was a

motivating factor for any employment practice, even though other factors also motivated the

practice."  42 U.S.C. § 2000e-2(m).  *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d

310, 317 (4th Cir. 2005) ("Congress amended the Civil Rights Act to provide explicitly for

liability in mixed-motive cases."), *cert. denied*, 546 U.S. 1091 (2006).

Nevertheless, Title VII "is not a general bad acts statute."  *Bonds v. Leavitt*, 629 F.3d

369, 384 (4th Cir.), *cert. denied sub nom. Bonds v. Sebelius*, 132 S. Ct. 398 (2011).  Nor is it "a

general civility code for the American workplace."  *Oncale v. Sundowner Offshore Servs., Inc.*,

523 U.S. 75, 80 (1998).  Moreover, it does not "'declare unlawful every arbitrary and unfair

employment decision.'"   *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994) (citation

omitted).  Rather, "[t]he crucial issue in a Title VII action is an unlawfully discriminatory motive

for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir.), *cert. denied*, 516 U.S. 944 (1995).

In the posture of this case, the facts and the law are considered in the context of a motion for summary judgment.  In resolving a summary judgment motion, a court must "'view[ ] all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *T-Mobile Northeast LLC v. City Council of City of Newport News*, 674 F.3d 380, 385 (4th Cir. 2012) (citation omitted).  Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

There is a factual dispute that permeates this case.  Mr. Hooker's accuser contended that he sexually harassed her, and Mr. Hooker adamantly denies that he did so.  Based on its own investigation, Hilton credited the account of Mr. Hooker's accuser and discharged Mr. Hooker.  However, the relevant question here is not whether Hilton's decision to discharge Mr. Hooker was "'wise, fair, or even correct.'" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.) (citation omitted), *cert. denied*, 531 U.S. 875 (2000).  A Title VII claim "'is not a vehicle for substituting the judgment of a court for that of the employer.'" *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (citation omitted).  Moreover, as I shall explain, the factual dispute as to whether Mr. Hooker actually sexually harassed his subordinate is not "material" to the legal issues, within the meaning of Rule 56.

The issue that I must address is whether Hilton discharged Mr. Hooker, in whole or in part, "because of [his] . . . sex."  42 U.S.C. § 2000e-2(a)(1).  In resolving this issue, I view the

facts in the light most favorable to Mr. Hooker as the non-moving party.  Accordingly, I shall assume, for purposes of this Motion, that Mr. Hooker did not sexually harass his co-worker, despite the accusation.

Nevertheless, even if Hilton believed the wrong person, and terminated Mr. Hooker erroneously on the basis of a false accusation, his termination would not necessarily have violated Title VII.  I must determine whether the evidence would permit a jury to conclude that Hilton made its decision on the basis of gender discrimination.  In other words, I must decide whether a rational jury could find that *the fact that Mr. Hooker is a male* caused Hilton to credit his accuser or discredit him, or caused Hilton to discharge Mr. Hooker on the basis of a mere accusation of sexual harassment, regardless of its credibility.  As I shall explain, plaintiff's claim of gender discrimination cannot succeed.

## B.  Factual Background

Hilton owns, operates, manages, and franchises a variety of hotel and resort brands around the world.  *See* Affidavit of Trudy Bauer ¶ 3 ("Bauer Aff."), Ex.1 to Motion (ECF 15-2).  In August 2008, Hilton began operation of what was then the newly-constructed Hilton Baltimore hotel.  *See id.*; *see also, e.g.*, "Baltimore's $300 Million Convention Hotel Opens to the Public," BALT. BUS. J., Aug. 22, 2008; "A Lure for the City: New Hilton Expected to Bring in Convention Business," BALT. SUN, Aug. 2, 2008, at B1.

Mr. Hooker was hired as an Assistant Executive Steward at the Hilton Baltimore on August 25, 2008.  Bauer Aff. ¶ 5.  It is undisputed that Mr. Hooker was an at-will employee.  *See* Deposition of John R. Hooker at 62 ("Hooker Dep."), Ex.3 to Motion (ECF 15-4).  On the first day of his employment, Mr. Hooker signed a form acknowledging his receipt of Hilton's

"harassment-free workplace policy," which prohibits all forms of sexual harassment.  *Id.* at 87.[3]

Plaintiff understood that, under the policy, employees were to report allegations of sexual

harassment to their direct supervisors or to the hotel's Human Resources department.  *Id.* at 91.

As an Assistant Executive Steward, Mr. Hooker reported directly to the Executive

Steward, Fabian Ahawe, who reported in turn to the Assistant General Manager, Jacque

D'Rovencourt.  *See* Bauer Aff. ¶ 6; Hooker Dep. at 93, 119.  Mr. D'Rovencourt reported to the

hotel's General Manager, Linda Westgate.  Bauer Aff. ¶ 6.  Mr. Hooker was responsible for

training and supervising stewards in the Stewarding Department.  *Id.* ¶ 5.  The Stewarding

Department, also known as the "back of the house," is responsible for the cleaning, storage, and

preparation for use of all of the dishes and utensils in the hotel.  Thus, stewards work primarily in

the hotel's food and beverage areas and kitchens, as well as restaurants within the hotel,

including the Diamond Tavern.  Bauer Aff. ¶ 5; Hooker Dep. at 62-63, 67.

Mr. Hooker supervised Keanna Jones, the co-worker who ultimately accused him of

sexual harassment.  Ms. Jones began her employment at the hotel around the time that it opened

in August 2008.  *See* Deposition of Trudy Bauer at 35 ("Bauer Dep.").[4]  Initially, Ms. Jones

worked in the Housekeeping Department as a uniform attendant.  *See id.* at 35-36; Declaration of

John R. Hooker ¶ 15 ("Hooker Decl."), Ex.A to Response (ECF 20-1).  However, in September

or October 2008, Ms. Jones was transferred to the Stewarding Department, working at the

Diamond Tavern.  *See* Bauer Dep. at 35-41; Hooker Decl. ¶ 15.  Mr. Hooker avers that he was

---

[3] Neither party has submitted a copy of the policy, but there does not appear to be any dispute as to its provisions.

[4] Trudy Bauer is the Director of Human Resources for the Hilton Baltimore, and has held that position since the hotel opened in August 2008.  *See* Bauer Aff. ¶ 2.  Ms. Bauer was deposed in connection with this litigation on August 19, 2011.  Both parties have submitted excerpts from the transcript of her deposition.  *See* Ex.4 to Motion (ECF 15-5); Ex.B to Response (ECF 20-2). I will refer to the pagination of the deposition transcript, rather than the pagination of either party's exhibits.

approached by Lorna Rivera, Ms. Bauer's assistant, who asked whether he "would agree to have Ms. Jones" reassigned to the Stewarding Department, because "Ms. Jones was having some difficulty in her current assignment." Hooker Decl. ¶ 15. At her deposition, Ms. Bauer stated that she had only "vague recollections" of Ms. Jones's transfer to the Stewarding Department, because her assistant "Ms. Rivera was more involved" in the transfer. Bauer Dep. at 36, 40. However, Ms. Bauer remembered that a basis for the transfer was that Ms. Jones was "very social," and Bauer had "some vague recollection of . . . something about flirtation, people talking about [Ms. Jones] being a little flirtatious . . . at the uniform room." *Id.* at 39.

Early in Mr. Hooker's tenure as Assistant Executive Steward, he also supervised Robson Gleson, an employee assigned to the Stewarding Department who was responsible for removing trash from the kitchen areas of the hotel. *See* Hooker Decl. ¶ 14. According to Mr. Hooker, it was "common knowledge" within the Stewarding Department that Mr. Gleson was "romantically associated" with Ms. Jones. *Id.* ¶ 14. Plaintiff also claimed that Mr. Gleson had several "performance issues," including "his over-attention to Ms. Jones during work hours." *Id.* After consulting with Mr. Ahawe, the Executive Steward, Mr. Hooker recommended to the hotel's Office of Human Resources that Mr. Gleson's employment be terminated for what Mr. Hooker describes as Gleson's "poor performance," which included Gleson's "relationship and preoccupation with Ms. Jones." *Id.* Mr. Hooker's recommendation "was approved through interaction that included" Trudy Bauer. *Id.*

According to Mr. Hooker, Ms. Bauer "personally directed that [Mr. Hooker] escort Mr. Gleson from the premises" upon Gleson's termination. *Id.* Mr. Gleson's termination occurred after Ms. Jones had transferred to the Stewarding Department. *Id.* ¶ 15. In his Declaration, Mr. Hooker states: "During the course of that encounter, Mr. Gleson threatened to 'get me,' advising

me to 'watch my back.'"   *Id.*   Mr. Hooker recounted this "threat" to Ms. Bauer, who allegedly told Mr. Hooker "not to worry."   *Id.*[5]

Plaintiff maintains that he "had to discipline Ms. Jones . . . early in her tenure with [the Stewarding Department] for various problems, both performance and disciplinary."   *Id.* ¶ 16. Mr. Hooker issued a written reprimand to Ms. Jones after he received a report from another manager, the hotel's Food and Beverage Assistant Director, that "she had seen Ms. Jones leave a staff ladies' rest room in the company of a male coworker." *Id.*[6]  Mr. Hooker "questioned both employees, and confirmed . . . that Ms. Jones had indeed accompanied the male co-worker into the rest room to show him a tattoo." *Id.*  At her deposition, Ms. Bauer recalled this incident, and recalled that both Ms. Jones and the male co-worker were disciplined for the incident.[7]   *See* Bauer Dep. at 42-45.  In Ms. Bauer's view, "the discipline was the right discipline for both of them."  *Id.* at 45.  However, Ms. Bauer was not personally "involved in the discipline," but only learned about it "after-the-fact . . . when it crossed [her] desk." *Id.* at 48.

According to Mr. Hooker, "[w]ithin about a month of the termination of Mr. Gleson," with the "concurrence" of the Executive Steward, Mr. Hooker "recommended to the Office of Human Resources, the termination of Ms. Jones for performance issues."  Hooker Decl. ¶ 17. However, Mr. Hooker claims that "Ms. Bauer took the initiative to advocate on behalf of Ms. Jones and prevailed upon [Mr. Hooker] to give Ms. Jones a second chance."  *Id.*  At her

---

[5] At her deposition, Ms. Bauer was questioned at length regarding Mr. Gleson's termination and her knowledge with respect to any relationship between Mr. Gleson and Ms. Jones.  *See* Bauer Dep. at 51-63, 164-66.  Ms. Bauer could not recall any specifics regarding Mr. Gleson's termination.  She remarked that the early months of the Hilton Baltimore's operation were "a crazy, busy time" with "high turnover" among staff, and that she simply had "no recollection of Bob Gleason [sic] for some reason."  *Id.* at 62-63.

[6] Plaintiff does not provide the date of this reprimand or the date of the underlying incident.

[7] Neither Mr. Hooker nor Ms. Bauer identified the male co-worker involved in this incident.

deposition, Ms. Bauer did not recall that Mr. Hooker had recommended Ms. Jones's termination. *See* Bauer Dep. at 58-60. Nevertheless, she noted that she had "coached" several of the stewards, including Ms. Jones, in connection with their job performance. *Id.* at 50. Ms. Bauer explained, *id.* at 50-51:

> Coaching is when—and, again, new hotel, lot of young employees; lot of [sic] inexperience working for big corporate hotels; lot of [sic] coaching involved us teaching them about attendance, showing up on time, not leaving their work area. We didn't want to go into a situation where we were disciplining our people all the time right off the bat. We wanted to coach and teach. That's how we committed to opening our hotel and giving some people some opportunities. So, many times managers would come down and meet with Lorna [Rivera] or I and we'd just talk to employees about time and attendance, work performance, giving you their best, trying to keep their job, they're on probation, things like that. So, did all those things turn to formal disciplines? [sic] Only when it started getting serious, and depending on how the manager, if they wanted to give people chances or not. So, there was a lot of that in the first year of opening that hotel.

On the night of New Year's Eve, December 31, 2008, the hotel expected to host several parties continuing late into the night and the early morning, requiring some members of the Stewarding Department to work late. *See* Bauer Aff. ¶ 7. Plaintiff was scheduled to work into the morning hours of January 1, 2009, and was also scheduled to work the morning shift on New Year's Day. *See* Hooker Dep. at 138, 152. Accordingly, Hilton gave Mr. Hooker a room at the hotel, Room 815, so that he could sleep at the hotel between his shifts. *Id.* at 139; *see also* Bauer Aff. ¶ 24. Several other members of the Stewarding Department also worked at the hotel the night of New Year's Eve, including Ms. Jones, who was working in the Diamond Tavern. Hooker Dep. at 167-68.

On or about Wednesday, January 7, 2009, Ms. Jones approached Ms. Bauer and reported that Mr. Hooker had made unwanted sexual advances toward Ms. Jones on New Year's Eve. Bauer Aff. ¶ 7. Ms. Bauer "spoke with Ms. Jones at length about her allegations," and "asked detailed questions and took careful notes of her responses." *Id.* ¶ 8. Ms. Bauer prepared a

"Record of Conversation," dated January 7, 2009, based on her interview of Ms. Jones, which both Ms. Bauer and Ms. Jones signed on January 8, 2009. *See* Record of Conversation, Ex.A to Bauer Aff. The Record of Conversation states:[8]

> Keanna Jones came to my office today to discuss concerns about her schedule. She feels that she is being treated unfairly as it relates to scheduling of hours. She alleges that her supervisor Mr. John Hooker has made unwanted advances towards her and is claiming sexual harassment.
>
> Keanna claims that on New Years Eve her supervisor John Hooker approached her workstation late in the night around 11:00pm (not sure of exact time)—and said "Come with me". She followed him as this is how he usually directs them to a new work area where help is needed. She proceeded to follow him to the elevator. She followed him to the 8th floor not sure of where or why she was going there, she thought maybe a cleanup needed. He opened the door to room 815 and said "I need you to come in here for a second". Once in the room he started touching her arm, she advised him to stop. He grabbed her pants and started to pull them down. She pulled away and said "No, I'm not into it". He said, "Didn't you go in the bathroom with Gregory. I got you four days this week." He continued to try touching her. She said I'm uncomfortable, he replied "I'll make you comfortable.["] She said I'm not into this, we can talk later. He said, "Oh, ok, we'll talk later.["] She left the room and went back to her work station in the Diamond Tavern, she was crying. She states she was gone for about 15 minutes. Two team members Carrie McCoy and Michael Harrison were there when she returned crying. She told them what happened. I asked her how they responded. She said the [sic] Miss Carrie told her to document things carefully so that if things happened again she had records. She told her she was in the hotbox. Michael told her to report it.
>
> Keanna stated that when she was ready to leave work that night at approx. 2:30am she saw John at the elevator, he held the door and suggested she come. She would not go on the elevator with him and instead went to the restroom.
>
> I asked if anyone saw her on the elevator. She states that a Banquet Houseman saw her, she thinks his name is Sean Manahan. I asked her to confirm his name too [sic] me when she finds out. She saw him later and he asked where she was

---

[8] If the Record of Conversation were offered in evidence for the truth of the matters asserted in it, it likely would be inadmissible, because it contains several layers of hearsay. But, the Court does not rely upon the Record of Conversation for the truth of the matters asserted. Indeed, it bears repeating that the Court assumes for purposes of the Motion that Ms. Jones's allegations to Ms. Bauer, as recounted in the Record of Conversation, were *not* true. Nevertheless, I recount the content of the Record of Conversation because plaintiff has not controverted it as documentation of what Ms. Jones told Ms. Bauer about the alleged incident.

going earlier.  She told him what happened and he said "leave it alone".  She thinks that he was going to his room when they were on the elevator.

Keanna, also claims that John Booker [sic] called her on Saturday [*i.e.*, January 3, 2009, *see* Bauer Aff. ¶ 16] to work when she wasn't scheduled.  She told him she couldn't on such short notice.  He told her to come in Monday [*i.e.*, January 5, 2009], he could give her hours.  She wasn't originally scheduled.[9]

I asked her if she was comfortable with me investigating this further as it was my responsibility.  She wants him to not do this again and is willing to move forward.  I assured her that there would be no retaliation as stated in our policy.

I advised her that I would conduct an investigation and get back to her.  We proceed[ed] to call her Manager, Fabion [sic] [Fabian Ahawe, the Executive Steward], to discuss her scheduling issues and he confirmed that she would work tomorrow Jan. 8, 2009.  We agreed that she would get a copy of her schedule every Thursday to avoid any confusion with start times.  She stated that she is very frustrated with the changes made to her schedule and the loss of hours.

In her affidavit, Ms. Bauer recounts the steps that she took to "follow[ ] up on [Ms. Jones's] allegations."  Bauer Aff. ¶ 18.  Ms. Bauer states, *id.* ¶¶ 18-30:

I first spoke with Mr. D'Rovencourt [the Assistant General Manager] to confirm whether Mr. Hooker was given a hotel room on the night of December 31st, and if so, what room Hilton provided.  Mr. D'Rovencourt informed me that Mr. Hooker was given Room 815, the exact room Ms. Jones identified as his room.

In addition to confirming the hotel room, I wanted to find out if Ms. Jones' assertion that she entered the room at approximately 10:30-11:00 p,m. could be confirmed.  So, I spoke with Hilton's Security Director to obtain a "key interrogation report", a document that lists all entry times for hotel rooms, for Room 815.  The Security Director provided me with the key interrogation report for Room 815.  The report indicated that Mr. Hooker entered Room 815 at 10:27 p.m.[10]

Because Ms. Jones was claiming that Mr. Hooker was offering her additional hours on days that she was not scheduled, I wanted to review the

---

[9]  In her affidavit, Ms. Bauer claims that Ms. Jones "informed [Ms. Bauer] that she did work the full day on Monday," January 5, 2009.  Bauer Aff. ¶ 16.

[10]  Ms. Bauer submitted a copy of the key "Interrogation Report" as Exhibit B to her affidavit.  It indicates that a "guest key" with "Key ID#:56" opened Room 815 at 7:19 p.m. and 10:27 p.m. on December 31, 2008, and at 12:29 a.m., 12:31 a.m., 1:57 a.m., and 2:30 a.m. on January 1, 2009.

weekly schedule and her time cards.[11]   I noticed that from a review of the documents, she worked a full day on Monday according to the time cards even though she had not been scheduled to work that day.  I also noticed that two other stewards, Tamall McMillan and Corey Coates, who were scheduled to work the full day on Monday, were sent home early after working only a half day. . . . Finding this to be unusual, I met with Mr. Hooker's direct supervisor, Mr. Ahawe, to determine whether he was responsible for the changes in the schedules.  Mr. Ahawe stated he was unaware that Mr. Hooker had called Ms. Jones into work on Monday.   Mr. Ahawe further stated that he had not authorized schedule modifications for Tamall McMillan or Corey Coates for that date.

I discussed my findings with Mr. D'Rovencourt and we agreed that we should schedule a meeting to speak with Mr. Hooker.

On or about January 8, 2009, Mr. D'Rovencourt and I met with Mr. Hooker to discuss Ms. Jones' allegations. We discussed the events of the night Mr. Hooker worked on New Year's Eve.  I thoroughly explained to Mr. Hooker all of Ms. Jones' allegations against him.  Mr. Hooker had time to ask any questions he had regarding the claims.

Mr. Hooker admitted that he did ask Ms. Jones to leave her work station late that night but could not recall the reason or where he may have taken her.

Mr. Hooker acknowledged he was given a hotel room on December 31st, and confirmed that it was Room 815.  I asked Mr. Hooker when he may have gone to his hotel room and the purposes of those visits.  Mr. Hooker recalled going to his room only twice but could not remember the time.  Although he initially struggled to remember why he went to his room, Mr. Hooker eventually told me that he was in his room to eat a sandwich and, then another time, to drop off his bag.  He could not recall the times he may have been in his room on either occasion.

I notified Mr. Hooker of the key interrogation report which indicated that he went to his room at least five (5) times that night, including once at 10:27 p.m. Mr. Hooker could not recall any other times he went to his room and had no explanation for why he went to the room late that evening.

I informed Mr. Hooker that Ms. Jones was alleging that on New Year's Eve he had taken her up to his hotel room and touched her in a sexually inappropriate manner.  I stressed to him that these were very serious allegations.

In responding to my questions about Ms. Jones' claims, Mr. Hooker never mentioned any issue with Ms. Jones' performance as an employee as a rationale for her making up or lying about such offensive conduct.  Mr. Hooker did not mention that Ms. Jones was creating this story because he fired her boyfriend or

---

[11] Ms. Bauer submitted copies of timekeeping records as exhibits to her affidavit.

disciplined her in any manner.  In fact, Mr. Hooker did not provide me with any motive, hostility, or animus that Ms. Jones may have had to assert these claims against him.  Mr. Hooker never provided any explanation as to why Ms. Jones may not be telling the truth, nor did he point out any evidence that would undermine in any way her allegations.  Instead, Mr. Hooker just denied that he sexually harassed Ms. Jones.  I was aware of an occurrence involving the discipline of Ms. Jones for a bathroom incident.  I did not consider that incident to be relevant to this investigation or bearing on Ms. Jones' credibility.  In any event, Mr. Hooker never raised this as an issue during our meeting or at any other time.  Further, Ms. Jones had no other discipline in her file at the time of this investigation and Mr. Hooker never mentioned any performance issues of Ms. Jones during the investigation.

We then discussed the issue of Ms. Jones' schedule.  Mr. Hooker admitted that he called Ms. Jones to report to work on Saturday and Monday even though she was not on the schedule. Mr. Hooker could not come up with a reasonable explanation for needing her to work on Monday.

I repeatedly asked Mr. Hooker to try to remember the events over the last week as he could not explain why he was in the hotel room at 10:30 p.m. and why he called Ms. Jones in to work when she was not on the schedule.  Despite giving Mr. Hooker the opportunity to give a reasonable explanation for his actions, Mr. Hooker could not provide an answer.

At the end of the interview, I informed Mr. Hooker that, in accordance with Hilton policy, he was being placed on suspension with pay and that we would contact him in the future.  I typed my notes from our meeting with Mr. Hooker and included it with my report.[12]

In her affidavit, Ms. Bauer also recounts that, after interviewing Mr. Hooker, she interviewed Ms. Jones's co-workers, to whom Ms. Jones said she had confided immediately after the alleged incident.  Bauer states, Bauer Aff. ¶¶ 31-33:

Following our interview with Mr. Hooker, I wanted to determine whether Michael Harrison and Carrie McCoy, the two stewards who allegedly were with Ms. Jones before and after her encounter with Mr. Hooker, could substantiate any of her claims.  I first met with Michael Harrison.  He confirmed that Ms. Jones left the work area with Mr. Hooker late in the evening, only to return about fifteen minutes later, upset and crying.  Mr. Harrison also recalled that when Ms. Jones returned she told him that Mr. Hooker had tried to touch her and have sex with

---

[12] Ms. Bauer submitted her "Report of Personnel Investigation" as an exhibit to her affidavit.  *See* Ex.F to Bauer Aff.

her.   I typed out some brief notes regarding my conversation with Mr. Harrison.[13]

I also met with Ms. McCoy, the other Steward who worked with Ms. Jones at the Diamond Tavern on December 31st.  Ms. McCoy remembered that Mr. Hooker had approached Ms. Jones in the work area about 10:30 p.m. and asked her to come with him.  Approximately twenty minutes later, Ms. McCoy told me that she observed Ms. Jones return to the Diamond Tavern.  At the time she returned, Ms. Jones was visibly upset and crying.  According to Ms. McCoy, Ms. Jones also looked scared.

I then asked Ms. McCoy if she had any conversation with Ms. Jones upon her return.  Ms. McCoy stated that Ms. Jones told her and Mr. Harrison that Mr. Hooker had taken her up to his room and tried to have sex with her and touched her inappropriately.  Ms. McCoy had urged Ms. Jones to report this harassment. Ms. McCoy also observed Mr. Hooker later that night nervously hanging around the Diamond Tavern more than usual.  As with the other witnesses, I typed my notes regarding my conversation with Ms. McCoy.[14]

In connection with her investigation, Ms. Bauer also interviewed "the lead steward, John Moore, to determine if he knew anything about Ms. Jones' allegations."  Bauer Aff. ¶ 34. According to Ms. Bauer, "Mr. Moore responded that he did not know of Ms. Jones' complaints, but was aware of another steward, Latisha Battle, who had complained about Mr. Hooker in the past few months."  Id.  Thus, Ms. Bauer interviewed Ms. Battle.  Id. ¶ 35.  She recounts, id.:

Ms. Battle told me that Mr. Hooker had acted inappropriately towards her on a number of occasions in the fall of 2008.  Ms. Battle elected not to report these incidents because she thought she could handle the problem and did not think anyone would believe her.   Ms. Battle remembered one incident where Mr. Hooker had loaned her money for parking.  According to Ms. Battle, Mr. Hooker repeatedly asked her what she would do for him in return, while touching himself in a sexual way.  Ms. Battle also recalled a time when Mr. Hooker called her at home to come into work on a day she was not on the schedule.  While on the phone, Ms. Battle told me that Mr. Hooker had asked her "Are you in bed with

_____

[13] Ms. Bauer submitted her notes from her interview with Mr. Harrison as Exhibit G to her affidavit.  According to the notes, dated January 8, 2009, Mr. Harrison "stated that Keanna left the work area with John late that evening and returned about 15 minutes later crying and saying he tried to touch her and have sex with her.  Carrie tried to calm her down."

[14] Ms. Bauer's notes of her interview with Ms. McCoy, dated January 12, 2009, are Exhibit H to Ms. Bauer's affidavit.  They are consistent with Ms. Bauer's summary quoted above.

your girlfriend?"  Following this interview, Ms. Battle signed a statement confirming what she had told me.[15]

In her affidavit, Ms. Bauer summarizes the conclusions that she and Hilton Baltimore

management reached in the investigation, Bauer Aff. ¶¶ 36-41:

> By January 12, 2009, I had completed my investigation.  I shared all of the information gathered during my investigation with Mr. D'Rovencourt, Robin Sterrett, Regional Director of Human Resources, and Linda Westgate [the General Manager of the Hilton Baltimore].

> We reviewed all of the information I had obtained, including the documents, interview notes and statements.  We were surprised that Ms. Jones knew that Room 815 was Mr. Hooker's hotel room.  We also found it interesting that Ms. McCoy and the key interrogation report confirmed Ms. Jones' account regarding the timing of the event (*i.e.*, Mr. Hooker took Ms. Jones away from her work station at approximately 10:30 p.m. while Mr. Hooker entered his room at 10:27 p.m.).  With that said, we were less concerned about the witnesses' statements as to the exact time and more persuaded by the fact that the witnesses were consistent in reporting that Mr. Hooker took Ms. Jones away from the Diamond Tavern at approximately 10:30-11:00 p.m.  However, this was not the only evidence that substantiated Ms. Jones' claims.  Ms. McCoy's and Mr. Harrison's observations that Ms. Jones was upset and crying when she returned approximately fifteen minutes later were also consistent with Ms. Jones' statements and the behavior of someone who had been harassed.

> The work schedule and time cards were additional evidence that supported Ms. Jones' claim that she worked Monday, January 5th, even though she was not scheduled to do so.  There also was something suspicious that, while Mr. Hooker had given Ms. Jones an extra shift, two other employees were sent home early that same day.  The fact that Mr. Ahawe had not known of the rescheduling heightened our suspicions regarding this arrangement.

> We also reviewed my notes regarding Mr. Hooker's statements.  We found that Mr. Hooker's lack of recollection about the events on New Year's Eve were not credible.  Specifically, Mr. Hooker could only recall going to his hotel

---

[15]  Ms. Bauer's notes from her interview of Ms. Battle are Exhibit I to Ms. Bauer's affidavit.  Mr. Hooker disputes Ms. Battle's accusations. With respect to the alleged loan, he states that he loaned Ms. Battle $20 for marking in Ms. Bauer's presence, in the context of a disciplinary meeting in which he had recommended Ms. Battle's termination for poor attendance and tardiness.  *See* Hooker Decl. ¶ 18.  At the meeting, according to Mr. Hooker, Ms. Bauer prevailed upon him to give Ms. Battle a second chance, and he loaned Ms. Battle $20 because she "offered that if she could get her car out of the parking facility, she could improve her attendance."  *Id.*  Mr. Hooker denies that there was any "attempted exchange proposed by [him] for sexual favors."  *Id.*

room twice despite the fact that the key interrogation report clearly had Mr. Hooker enter his room five times that night.  Mr. Hooker also could not recall why he took Ms. Jones away from her work station.  In addition, the fact that Hooker failed to remember why he had asked Ms. Jones to come in to work on a day she was not scheduled while other employees were sent home on that same day was suspect, and seemed to support Ms. Jones' allegations.  Finally, while not determinative, we considered the information provided by Ms. Battle as indicating that Mr. Hooker was capable of committing improper sexual acts towards a subordinate female employee.

I interviewed every witness I could think of and reviewed all of the documents that were pertinent to the issues raised by Ms. Jones.  All of the evidence seemed to point in only one direction—that Ms. Jones was telling the truth.  Mr. Hooker just denied that he sexually harassed Ms. Jones without providing any explanation for going back to his hotel room as many times as he did or removing Ms. Jones from her work station.  In fact, Mr. Hooker presented no evidence that would support his denials.

After considering all of the evidence, we came to a consensus that Ms. Jones was credible and that Mr. Hooker had violated the Harassment-Free Policy, and that his conduct warranted termination of his employment.

Therefore, on January 12, 2009, Ms. Bauer informed Mr. Hooker that his employment was terminated.  In her affidavit, she recalled:  "During our conversation, Mr. Hooker did not mention Ms. Jones's allegations; instead he only asked about reimbursement of his expenses and paid time off."  Bauer Aff. ¶ 42.

According to Ms. Bauer, Hilton Baltimore dealt with one other alleged incident of sexual harassment in 2009.  It involved a man named Alphonse Mpia, who was Mr. Hooker's successor as Assistant Executive Steward, and a female subordinate (not Ms. Jones).  *See* Bauer Aff. ¶ 43. After an investigation, management determined that Mr. Mpia was more credible than his accuser, and he was not terminated.  *Id.* ¶ 44.  Ms. Bauer also notes that Hilton's personnel records indicate that, at other hotels, there have been occasions in which female employees have been terminated for violating Hilton's "harassment-free policy," although she acknowledges that these instances did not involve sexual harassment, but rather concerned "unprofessional and/or

inappropriate behavior towards their fellow employees." *Id.* ¶ 45.

At his deposition, Mr. Hooker disputed the account of events that Ms. Jones gave to Ms. Bauer regarding the alleged incident on New Year's Eve.  He acknowledged that he went to his room several times during the evening of New Year's Eve, but stated that he had gone on one occasion to drop off his backpack, and on another occasion to get his coat and his wallet, because he and another employee had gone to Wal-Mart to purchase paper plates.  *See* Hooker Dep. at 154-158.  He had also gone to his room at some point to eat a sandwich, and had gone to his room at the end of his shift to sleep.  *Id.* at 161-62.  He could not specifically recall going to his room at around 10:30 p.m., but stated that he did not dispute that he had done so in light of the hotel's records indicating his key was used at about that time.  *Id.* at 164.

However, Mr. Hooker did not contest Ms. Bauer's account of their meeting.  Nor did he question Ms. Bauer's motives.  Indeed, he did not believe that Ms. Bauer or other members of management "intended to discriminate" against him.  *Id.* at 228.  Describing Ms. Bauer as an "honest" and "fair person," *id.* at 123, Mr. Hooker claimed she made an "honest mistake." *Id.* at 222.  But, Mr. Hooker complained that it was his word against the word of Ms. Jones; there was no way that he could "physically prove" that the alleged sexual harassment did not occur, and the Hilton management should have believed him.  *Id.* at 214-15.

Notably, Mr. Hooker testified that it was his "assumption" that Hilton discharged him on the basis of gender discrimination.  But, he acknowledged that he did not "have any evidence" to support this assumption.  Hooker Dep. at 17.

In his Declaration, Mr. Hooker insists that "the investigation conducted by [Hilton] was woefully inadequate given the circumstances it never thought to consider or questions it never sought to ask."  Hooker Decl. ¶ 20.  In particular, although Ms. Bauer interviewed plaintiff, he

complains that, during the course of the investigation, he was never "shown a written accusation or ever given the chance to respond to any such written allegations or even a detailed oral presentation." *Id.* ¶ 19.   Yet, Mr. Hooker does not indicate that he ever brought to Ms. Bauer's attention during the investigation the prior disciplinary history of Ms. Jones and her then-romantic interest, Mr. Gleson.   In his affidavit, Mr. Hooker states that he did not recall the disciplinary history of Ms. Jones and Mr. Gleson until he was interviewed by his attorney in June 2009.[16]   Hooker Decl. ¶ 13.

## Discussion

As noted, in resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.   *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).   "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.   *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).   The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at

---

[16] Mr. Hooker initially retained his attorney in connection with an appeal of his denial of unemployment benefits.   *See* Hooker Decl. ¶ 12.   As an exhibit to his Response, Mr. Hooker has submitted a DVD containing an audio recording of his initial unemployment benefits hearing, at which both he and Ms. Bauer testified.   *See* Ex.1 to Hooker Decl..   However, Mr. Hooker has not provided a transcript of the hearing, nor does he cite any particular passage in support of his case or indicate that Ms. Bauer's testimony at the hearing in some way contradicts her affidavit or her deposition testimony.   "'The court is not required to scour the record looking for factual disputes'" to which the parties have not directed it.   *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011) (citation omitted).

249.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997).  "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'"  *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original), *cert. denied*, 535 U.S. 933 (2002).

Alternatively, the plaintiff may use the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  If the employee plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination."  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).[17]

---

[17] *McDonnell Douglas* involved a claim of racial discrimination.  The prima facie case of racial discrimination in hiring was formulated as follows, 411 U.S. at 802:

(i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was

If the plaintiff establishes a prima facie case, by a preponderance of the evidence, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

If the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See also Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez*, *supra*, 57 F.3d at 378) (emphasis in original). Put another way, if the defendant proffers a legitimate, non-discriminatory basis for its actions, the plaintiff is essentially in the same position he would be in if he were proceeding under ordinary principles

---

qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

of proof: he must adduce direct or circumstantial evidence that could persuade a fact finder that he was the victim of invidious discrimination.

Thus, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'" *Merritt*, *supra*, 601 F.3d at 294-95 (citation omitted). In other words, "the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination." *Id.*

For purposes of the *McDonnell Douglas* scheme, the Court can assume, for the sake of argument, that plaintiff has made out a prima facie case, because there is no dispute that the basis for his termination was Hilton's conclusion that plaintiff sexually harassed his female subordinate. An employer's good faith belief that an employee engaged in sexual harassment is a legitimate ground to terminate that employee. *See, e.g.*, *Wheeler v. Aventis Pharma.*, 360 F.3d 853, 858 (8th Cir. 2004) ("We agree that an employee's termination for violation of a sexual-harassment policy could be a legitimate, non- . . . discriminatory basis [for termination]."), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 & 1059 (8th Cir.) (en banc), *cert. denied*, 132 S. Ct. 513 (2011); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991) ("Sears has articulated a legitimate nondiscriminatory reason for firing Elrod—that Sears believed he had been sexually harassing female employees."). As the Supreme Court has taught, when the employer meets its burden of articulating a legitimate basis for termination, "the *McDonnell Douglas* framework . . . simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11; *see also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district

court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.") (emphasis in original); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (assuming, *arguendo*, that plaintiff presented a prima facie case where employer proffered a legitimate, nondiscriminatory reason for adverse employment action), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006) (same); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc) (same); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005) (same).

Thus, to proceed here under either proof scheme, plaintiff must advance direct or circumstantial evidence of intentional discrimination. Under the circumstances of this case, the issue is whether, by crediting plaintiff's female accuser, Hilton discriminated against plaintiff on the basis of his gender. Plaintiff has advanced absolutely no evidence from which a fact-finder could legitimately draw that conclusion. Indeed, as Hilton points out, plaintiff conceded at his deposition that his contention that Hilton management believed his accuser over him because he is a man and she is a woman was simply his "assumption"; he did not "have any evidence" to support it. Hooker Dep. at 17.

To be sure, it is conceivable that an employer might have a spoken or unspoken policy of crediting any claim of sexual harassment brought by a female employee, and disbelieving any male employee's denial. Or, a manager investigating a sexual harassment claim might, on the basis of gender stereotypes, be more inclined to believe a female accuser than a male accused. If so, the male employee might have a cognizable Title VII claim. But, plaintiff has not pointed to any evidence that such was the case here. To the contrary, he has made an assumption, without any evidentiary foundation, that Hilton believed his accuser based on her gender. Yet, it is abundantly clear that Ms. Bauer did not simply accept Ms. Jones's version of events without

investigation, or rely on Ms. Jones's word to resolve a pure "he said / she said" conflict, without corroboration.

Even if Ms. Bauer's investigation of Ms. Jones's allegation was flawed in some way, or could have been more thorough, the extent to which Ms. Bauer investigated the claim undercuts plaintiff's position. The Court's research has uncovered a relatively recent decision of the Second Circuit, *Sassaman v. Gamache*, 566 F.3d 307 (2d Cir. 2009), which provides guidance.

In *Sassaman*, as in this case, the plaintiff brought a Title VII suit against his former employer after he was forced to resign on the basis of a female co-worker's accusation of sexual harassment. *See id.* at 309-11. After the district court granted summary judgment to the employer, the Second Circuit vacated the judgment. It focused on a statement allegedly made to the plaintiff by his supervisor in the course of explaining the decision to demand the plaintiff's resignation: "'[Y]ou probably did what [the female co-worker] said you did because you're male.'" *Id.* at 312. According to the *Sassaman* Court, "a reasonable jury could construe this statement as an invidious sex stereotype." *Id.* Although the defendant characterized the supervisor's comment as an "'aside'" and a "'mere stray remark,'" *id.* at 312-13 (quoting defendant), the Second Circuit stated: "The choice between plausible interpretations of [the supervisor's] remarks is a question of fact to be resolved by a jury." *Id.* at 313.

Notably, the *Sassaman* Court also stated: "The allegation that defendants made minimal—if any—efforts to verify [the co-worker's] accusations could be construed by a reasonable jury as *further evidence* that Sassaman's forced resignation occurred under circumstances giving rise to an inference of discriminatory intent." *Id.* at 314 (emphasis added). But, the *Sassaman* Court made clear that the alleged inadequacy of an investigation, by itself, would not permit a claim to go to the jury. It said, *id.* at 315:

We emphasize that we do not hold that an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action against the accused is, standing alone, sufficient to support an inference of discriminatory intent.  Rather, we hold only that where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent.

Here, plaintiff cannot demonstrate that Hilton's investigation supports an inference of discriminatory intent.  Even if Hilton's investigation of the incident was somehow unfair to Mr. Hooker, this would not amount to a cognizable Title VII claim unless plaintiff could present some direct or circumstantial evidence that the unfairness of the investigation was gender-based. Nor has plaintiff identified any evidence that would permit a jury to infer that Hilton's termination decision was based on a sex stereotype.

Instead, plaintiff insists that his case should go to the jury simply because of the dispute as to whether he actually engaged in sexual harassment of Ms. Jones. The sum total of plaintiff's argument in his Response (which is devoid of citation to authority) pertains to this dispute, Response at 12-13:

> Plaintiff's theory proceeds from the premise that he never sexually harasses the accuser. If a reasonable jury believes him, then the Defendant Employer's investigation has nabbed an innocent man—plainly not its professed objective. In exploring how such an event could have occurred . . . either the Defendant Employer committed human error or its investigation was predisposed on some basis.
>
> *    *    *
>
> In this case, the Defendant Employer seeks the benefit of the inference that its fair and thorough investigation should establish beyond dispute that its conclusions have nothing to do with gender bias.  The clear implication of its argument is that it is entitled to an inference of gender neutrality by reliance on an investigation that happened to get its gender justifying conclusion wrong.  Ultimately, the Defendant Employer's argument is grounded on the presumed correctness of its finding of sexual harassment in a case where the underlying harassment is at issue.

The proper standard would not extend such inference to benefit the non-moving party absent clear acknowledgement at the very least that the underlying harassment in fact took place, which is not the case here.

In focusing on whether plaintiff engaged in sexual harassment, plaintiff misses the mark. Plaintiff seeks to use this lawsuit as a vehicle to litigate to a jury whether he sexually harassed Ms. Jones.  Hilton determined that he did so, and whether Hilton was correct is beside the point, so long as Hilton's decision to discharge plaintiff was not based on gender discrimination. Plaintiff has not presented any evidence, even of a circumstantial nature, that would permit the jury to draw the conclusion that Hilton's "investigation was predisposed on some basis." Response at 12.  Even if Hilton reached the wrong conclusion, its termination decision would not offend Title VII, so long as Hilton was not motivated by gender discrimination.

To be sure, if Hilton's credibility determination was incorrect, and Mr. Hooker did not sexually harass his co-worker, his termination was extraordinarily unfortunate.  But, without more, this does not constitute a violation of Title VII.  "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005).  Therefore, Hilton is entitled to summary judgment.  An appropriate Order follows.


Date:   July 6, 2012                              _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge